USA v. Riedel-Nicholson Go ahead, Mr. Ovseovic My name is Jay Ovseovic, and I'm here on behalf of the appellant, Riedel-Nicholson. In my papers, I tried to give you a feeling for who Mr. Nicholson is. He's a person of very modest means, who has tried to keep himself employed through temporary agencies and by trying to create his own businesses. He put food on his table by fishing. He transported himself throughout the city of Rochester year round by bicycle. He's also an avid lottery player, living on the dream that one day he could strike it rich. And then one day, he received a letter from Worldwide Award Group telling him that his ship came in. He was told that he won $15 million in the Jamaican lottery. Rather than enjoying the easy life, Mr. Nicholson's problems only just began. Unable to pay what he was told was the taxes that were necessary for him to collect his winnings, he was told that sponsors would be willing to send him money so that he could pay his fees, and then he would just have to pay those sponsors back when he received his reward. He agreed to do so. It turned out that he became a blind money mule, an unwitting accomplice in a lottery scam. Well, I've raised four points in my brief. I want to focus my arguments this afternoon on the applicability of the vulnerable victim enhancement and the enhancement for obstruction of justice. If there's time left, I will address the remaining issues in my brief or answer any questions that you have as to those issues. You've described Mr. Nicholson as an unwitting money mule, but my reading of the record is that he collected $145,000 from Mr. Jessen, I think, and of that transferred only $41,000 and kept $100,000 for himself. Is that correct? I do not believe that is correct, Your Honor. He sent money, and there was money that was sent to Jamaica, there was money that was sent to places in the United States and elsewhere. What they've documented was the money that was sent through wire transfer services to Jamaica. How much did he retain for himself? Does the record show? It doesn't show an exact amount. He testified that he only kept a small amount of money that Mr. Peterson, the person who brought him into this scam, told him to keep for himself when he asked for a little bit of money so that he could pay for meals because he was unable to fully support himself. But there is no large amounts of money that he stored or that he banked, and it's never been documented or shown. So it's incorrect that he kept over $100,000 out of that? To my knowledge, there is no evidence of that whatsoever, Your Honor. Is it correct that he knew that Mr. Jessen was an elderly person? In his statement to Special Agent Krembliss and Inspector Mann, he stated that Mr. Jessen was elderly. However, we don't know when he learned that he was elderly. He may have learned that when the agents first came to interview him and talk to him when they executed the warrant. Prior to that, he had no direct contact with Mr. Jessen other than Mr. Jessen sending him funds that Mr. Jessen was forwarding to him. The only other contact was one letter that he was directed to send Mr. Jessen by Mr. Peterson. That was the only time he contacted Mr. Jessen. That's the only knowledge he had of Mr. Jessen directly that he reached out to him. Otherwise, he had never identified him. He never reached out to him. He never called him. He never spoke to him. Do you think there was no basis on whether it's that he selected the victim or that he knew the victim was vulnerable? Do you think there was inadequate foundation? There is no foundation that he selected the victim, that he knew the victim, that he created any lists identifying any alleged victims. In the PSR, there's other alleged victims who did not come up in the charges, but there's nothing showing that Mr. Nicholson ever identified these people or knew who these people were other than them sending him material money to forward on. Thank you. How did he contact Jessen, or how did they come into contact? My understanding is that the people who were arranging this scam had contacted Mr. Jessen, and they either called him or sent him a letter. I don't know exactly which. I don't recall that there was evidence of that within the trial, and that these other individuals told Mr. Jessen to send forward the money to Mr. Nicholson. I believe the record also shows that Mr. Jessen was told to send other funds elsewhere and that he made an attempt to send funds to Canada, which I believe was Canadian Customs, did not allow into the country and returned to him. But it was not Mr. Nicholson who was reaching out to Mr. Jessen until the one time that Mr. Peterson told him to send him a letter, and you do have a copy of that letter in the record in various places. What was that letter about? The letter was telling him to send one final payment, and that was the only time that Mr. Nicholson ever reached out to him. Otherwise, all contact was one way from Mr. Jessen to Mr. Nicholson. That was the April 14 letter. Correct, Your Honor. I believe that is correct, Your Honor. Asking for a final payment of over $14,000. Yes, Your Honor. There must be a nexus for the vulnerable victim enhancement to be applied. That's the first requirement that must be met. If a nexus exists, the court must then find that the defendant singled out the vulnerable victim from a larger class of potential victims. That did not occur in this case. There must be an individualized finding. It cannot be based on any broad generalizations about victims based on their membership in a particular class. And here the district court imposed two levels based on the statement, which only acknowledged that Mr. Jessen was elderly, not saying when Mr. Nicholson learned of this, and Inspector Mann's testimony that lottery scams target the elderly. Even if this court were to find a nexus between the vulnerability and the criminal conduct, there is no evidence that Mr. Nicholson targeted anyone from a larger class of potential victims. I'd also like to address the procedural error that occurred with the application of the obstruction of justice enhancement. The court imposed this enhancement because Mr. Nicholson's written statement to law enforcement did not materially differ from his trial testimony. However, if we look carefully at his written statement and his testimony, we'd find that they really do not materially differ. According to the district court, Mr. Nicholson's testimony was false, misleading, and was contrary to the written statement he made when he was arrested. However, if we look at both his statement and the testimony, Mr. Nicholson noted that he had a question as to the legitimacy of the lottery, but he also believed that Mr. Peterson was still sponsoring him. And if we look at Inspector Mann's testimony, we find that victims of lottery scams, which Mr. Nicholson was, even when they're told that they're victims, they're still known to send money to the scammers under the belief that they really think they're going to receive their winnings. And here we have Mr. Nicholson believing that he's still going to be able to collect. So while he may have questions, he still believed that he was going to collect his winnings. I notice the red light is on. May I continue, Your Honor, for a moment? Thank you. His statement did acknowledge that Mr. Jessen was elderly, but he does not state when he learned that Mr. Jessen was elderly. He testified, however, that he did not know that Mr. Jessen was elderly when he was sending him the checks. We do know, in analogous situations, that many individuals who've been found to falsely confess to crimes will often give details of crimes that were not known to the public. We don't know when they've learned this. Often it's when they're being interviewed by law enforcement, and it may have been when law enforcement was talking to Mr. Nicholson that he learned of this, that Mr. Jessen was, in fact, elderly, and that he put that in his statement. But the record does not show when he learned this. He admitted, didn't he, in a written statement, that he had suspicions that this was maybe illegal, some kind of illicit activity as early as October 2011? There was a question as to whether or not he had some doubts about it, but again, he also believed that this was a legitimate process, a legitimate lottery, and that this was how it worked, and it was because of the continued contacts that he had from Mr. Peterson, why he believed this. But he also had suspicions at the same time? Well, there were some doubts, yes, but nothing telling him that he should stop doing this, or that this was altogether wrong. Thank you, Counsel. You've reserved some time. Thank you, Your Honor. Good afternoon, Your Honors. May it please the Court. John Field for the United States. Mr. Nicholson had his opportunity to convince the jury that he had an innocent state of mind. The jury didn't buy it, and from the government's perspective, that's pretty... He's talking about two specific adjustments that cost him some years. That's correct, Your Honor. In terms of the two adjustments, the first one, the vulnerable victim adjustment, we have a variety of different sources of evidence. Well, first, the judge, the sentencing judge, found that he knew that Mr. Jessen was elderly. The question is, is there support in the record for that? Yes, there is. There is his confession, Your Honor. Did he say he knew it at the time? He did not say he knew it at the time. Is that a question? It's a handwritten confession. Isn't that the question, whether he knew it at the time of the violation? This was his first encounter with law enforcement. They walked in his door. Isn't the timing question, did he know the man was elderly at the time of the commission of the crime? That's the way Judge Larimer interpreted his confession to be. That's how the judge interpreted the confession. Did the confession say that? The confession says, and if you'll indulge me, I'll try to look at it so I can read verbatim what he said. It is that. This is Exhibit 33, Your Honor, which looks like page 161 of the appendix and page 9 of the government's supplemental appendix. What he says is that he realized he was in a scam in October 2011 due to this check, and then he goes, at this time I realized first that he was being scammed, that I was being scammed, and at this time I realized I was also a part of the scam and was accepting money from other people until approximately December 2014. I realized I was taking money from Mr. Jessen, who was elderly, referred to me by Mr. Peterson, which was approximately $148,000. He was elderly, and the representation at the proceeding was that he gained that knowledge from the agents. When they interviewed him long after the crime, the representation was they told him he was elderly. Did you extract from the agents any statement that no, no, no, we never told him that? No, I did not. No, you didn't. I did not ask that question. So the record stands uncontradicted that he learned that from the agents. Well, I think the jury rejected that testimony, Your Honor, and found that testimony is incredible. The jury wasn't asked about the adjustment. The jury was asked guilty or innocent. He's guilty whether he knew the man's age or not. Well, the defendant's story wasn't just that he learned the man's age afterwards. His testimony was also that he learned that he was participating in a scam afterwards. I understand. So his timing. I don't even think he's – well, maybe he is, but I didn't think he was even urging us to say the evidence of guilt is insufficient. He's talking about an – this enhancement cost him, what, 17 months? It's a two-level enhancement, Your Honor. It cost him 17 months. I know we like to talk about levels and months. It's a year and a half of his life, right? Possibly, yes. Possibly? I don't know whether the judge would have imposed the sentence that he did, whether or not the enhancement applied. I just can't answer that question. As it stands now, when you get two levels in this Category 3, it costs you 17 months. Is that right? I don't know. I haven't looked at it that way, Your Honor. I apologize. But if that's what the book shows – You ought to know when we're talking about whether an adjustment is proper how much time it adds, don't you think? That's just not – that's not something that factored into my thinking. I think the adjustment needs to be decided as a proper or improper irrespective of how much time it adds to the sentence. I'm not suggesting that tells you whether it's improper, but it's just a fact one ought to know. In any event, let's go on the assumption that it does cost him 17 months. You can correct me later on if you find it. No, I accept that, Your Honor. I'm not quarreling with that. Now we're back to the – and it's only valid if he knew at the time. That's correct. The time. That's correct. And he says, or his lawyer represented, the agents told him that, and you didn't extract anything to the contrary from the agents, right? Well, what the agents' testimony was that when they went to arrest him and he agreed to be interviewed, he gave the statement and they did not put words in his mouth. Right. So there's nothing in the record to suggest that they told him that this person was elderly and that, therefore, he repeated that back to them and said this person is elderly, which tells me, Your Honor, that he knew. Absence of evidence. But there's nothing in the record that he knew it at the time, right? Just his statement that he knew it. He doesn't say at the time. Well, he says he knew it on the date of the arrest. As of that date, he knew it, which was long before he met Mr. Jessen. Long before he met Mr. Jessen? Yes. He never met Mr. Jessen. Yes, he did, actually. During the proceedings later on, there was a deposition with Mr. Jessen. But not during the crime. Not during the crime. He never met him. He never met him during the crime and said, gee, there's this old man who I've been policing. That's correct, Your Honor. It never happened. As far as we know, that's correct, yes. But if I may, Judge, a victim's age, in any event, is not enough to conclude that the person is elderly, so the age is one piece of it. The other piece is that Mr. Jessen repeatedly sent him a large amount of cash, and that he indisputably knew, that over the period of one year, because that shows, and the case law, I believe, supports this, that when a victim is repeatedly victimized and keeps on sending additional money as a result of one of these sorts of telemarketing scams, that is an indicia, a strong indicia, of vulnerability. You're talking about the telemarketing case of the guy who owned the company? The O'Neill case, yes, Your Honor. He didn't own the company. He did. Right. He did. The fellow didn't own the company, did he? No, he didn't, but he should have known. He reasonably, the government's position, in any event, is that he reasonably should have known, based on the sheer number of mailings. So you get 17 months for what you reasonably should have known? And I believe that the court found, the district judge found, that he knew he was elderly, based on the confession. He knew of the repeat conduct, which was another factor that went into the district judge's determination to apply the vulnerable enhancement. Does he say that? Yes, he does, Your Honor. And that is at page 390 of the record. And what specifically Judge Lamer said is, I'm able to find by a preponderance based on Mr. Nicholson's own statement at the time of his arrest and the nature of this enterprise and the repeat conduct for Mr. Nicholson that the vulnerable victim enhancement should apply. And you think the repeat conduct, if you scam a person repeatedly, that shows you know he's elderly? No, you know he's vulnerable. He's vulnerable to the crime. So every time the postal inspector comes along and has six mailings, as they often do, or 20, all those victims are vulnerable? I'm sorry, could you say that again? Postal inspectors bring you cases of repeat mailings that are fraudulent. Are all those victims vulnerable for purposes of the enhancement? I'm not sure that I understand the question. I'm trying to get at whether doing the crime more than once with a victim justifies a vulnerability enhancement. I think that's certainly a factor that the court will consider, is whether was this person, did they just send in on one occasion $5,000, nothing comes, they're promised whatever, they send in the $5,000 on day one, nothing comes, and then they stop. All right? As opposed to the person sends in $5,000 on day one, they don't get what they bargained for or they thought was coming to them, the BMW or the lottery winnings, and then a few days later they send another $5,000, and then a month later $20,000. That's what the commission meant by a vulnerable victim, someone who's sort of- Yes. So stupid. How about their statement that just in the application note, what does that tell you? Well, it addresses, it says a victim is vulnerable when they are particularly susceptible to the crime, and I would respectfully submit that repeatedly sending money to someone, cash, large amount of cash, indicates that you are particularly susceptible to this particular type of a crime. In your submission to the district court, you represented the government believes that a December 31, 2012, mailing from victim one to the defendant contained a copy of a license. That's correct. Is that victim one? Victim one is Mr. Jessen. That was not something that was introduced at trial, but during the investigation we obtained evidence of various mailings. We were able to identify for every mailing of cash a corresponding withdrawal from the victim's bank account. There were a couple of mailings where there was no indication that cash was sent. We did receive notes from the victim indicating that he'd mailed a copy of his driver's license. Now, the victim couldn't testify at the deposition that he specifically remembered doing it, but he did provide us with a note saying that he'd done that. That's something the court took into account? I think the court said it was not comfortable relying on that particular piece of information and imposed the vulnerable enhancement notwithstanding its decision not to rely on that information. Thank you very much. If there's no further questions, we ask for- What about the obstruction enhancement? Well, the obstruction enhancement was, again, based on his decision to testify to a variety of things that the jury rejected, including the fact that he characterized his April 14th letter as not a request for Mr. Nicholson to send money, but he characterized it as a statement by him that Mr. Jessen was about to receive money as opposed to saying it. So that was one lie. Going back very quickly to the vulnerable victim, would you say that a victim who is senile is vulnerable to a scam? Oh, yes. Absolutely, Your Honor. Yes. The commission says, referring to this adjustment, it would not apply in a case in which the defendant sold fraudulent securities by mail to the general public and one of the victims happened to be senile. That's correct. The commission says being senile doesn't get you the enhancement. But we're not- You think that makes you vulnerable. Well, what that point addresses, Your Honor, is a situation where they're not targeting. They're not specifically going after someone who is vulnerable. They send out a mass mailing. It doesn't say anything about targeting. It says, and one of the victims happened to be senile. That's correct. And it was more, in this case, it was more than just one of the victims happened to be senile. The only victim here was senile. And he was repeatedly victimized over the course of a year. So that's the difference between the situation here and the hypothetical posited in the application note, which is really designed to address mass mailings where it gets sent to everybody and then somebody happens to respond, falls for it, and that's sort of the extent of it. They say, in that situation, it's not fair to apply the vulnerable victim enhancement. This is different. The defendant's conduct is much more culpable. He knew this man was vulnerable. He received $148,000 from this person over the period of a year and a half. And according to Mr. Nicholson himself, he felt he was part of the scam, that he'd been scammed. So he knew full well what was going on. He just chose to participate in it. He knew he himself was vulnerable. Is that the idea? Well, that's what his claim is. That's how he tried to pitch it. And I don't dispute the fact that at one point he mailed some money in and maybe it was taken. And Inspector Mann testified that during the interview that Roydell Nicholson told her that Mr. Peterson said, please don't go to the police. I've got a way for you to make your money back. All you have to do is accept mailings from various people and forward it along in accordance with my instruction, which is, of course, exactly what he did. Okay. The defender has reserved two minutes. Thank you, Your Honor. The government wants you to characterize that the jury completely believed their case and did not believe anything that Mr. Nicholson testified to. I think it's worth remembering that the government charged Mr. Nicholson in seven counts. Counts one through six were basically identical counts, and they acquitted him on counts one through three. So the jury in some way believed him or some members of the jury believed him, and they split the verdict. Why they reached this conclusion, we do not know. The real question is what did Mr. Nicholson know at the time that he was receiving money from Mr. Jessen? The record does not show that he knew that Mr. Jessen was vulnerable at the time. Then there's further, there's nothing showing that Mr. Jessen, excuse me, yes, Mr. Jessen was senile. Did you make this argument as fully as you're making it here to Judge Larimer? Yes, sir. That was made to Judge Larimer. And how did he respond to that? Judge Larimer did not accept the argument, Your Honor. I gather that. Unfortunately, I can't read microscopically small records. I tried giving you some of the larger statements within the brief itself, but if on page A390, if you look on page 19, you see Judge Larimer's conclusions that I think Mr. Saccone heard Mr. Nicholson's testimony, and I just did not find it credible. In fact, I found that it was false. Misleading was contrary to the written statement that he made when he was arrested. So Judge Larimer did not believe it and did not buy it. He also did not accept the material represented. What was the basis for that decision, you think? What was the record on which Judge Larimer arguably relied? He relied on the written statement that Mr. Nicholson made to the law enforcement officers, and he relied on Inspector Mantz's testimony as to how these lottery scams take place. He did not make an individualized finding as to whether Mr. Jessen was the vulnerable victim. And your client didn't testify? No, he did testify, Your Honor. He did testify? Yes. Did he testify on this question? He testified that at the time he did not know that he was receiving the funds, that he did not know that Mr. Jessen was elderly, and that was his testimony. I see. So he testified, and we can assume that Judge Larimer made a credibility finding. On that, yes, Your Honor. And what was the page, A390, and which of the microscopic pages are you relying on? Page 19, Your Honor. Page 19. Yes, on A390. What lines? Starting at line 13, and it continues on to page... Yes. And it continues on to the next page. I think there's some actually on A18 as well where he says, I find by preponderance based on his own statement that at the time of his arrest and the nature of this enterprise and the repeat conduct for Mr. Nicholson that the vulnerable victim enhancement should apply, and then he goes on to the credibility. Yes, but the repeated conduct was him receiving mailings from Mr. Jessen. It's not that he went out and reached out to Mr. Jessen. Ah. So that's what the repeated conduct is in this case. Thanks very much. We'll reserve the decision. Thank you, Your Honor. Thank you very much for your arguments.